# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                 No. CR 13-04004 RB

MARIO SERRANO,

      Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW
## AND ORDER DENYING MOTION TO WITHDRAW PLEA OF GUILTY

**THIS MATTER** is before the court on Defendant's Motion to Withdraw Plea of Guilty. (Doc. 77.)  The Government opposes the motion.  (Doc. 83.)  The Government charged the defendant, Mr. Serrano, with (1) conspiracy to possess with intent to distribute 50 grams and more of methamphetamine under 21 U.S.C. § 846; (2) possession with intent to distribute 50 grams and more of methamphetamine under 21 U.S.C. § 841(a)(1), (b)(1)(A); and (3) possession of a firearm and ammunition by a felon under 18 U.S.C. § 922(g)(1).  (Doc. 18.)  Mr. Serrano pled guilty to all three counts on July 15, 2014.   (Doc. 68.)

In his motion to withdraw his guilty plea, Mr. Serrano asserts legal innocence, involuntary entry of his plea, and ineffective assistance of counsel.  (Doc. 77.)  These claims hinge on Mr. Serrano's argument that his previous attorneys refused to file a motion to suppress evidence, which may have excluded evidence necessary for a conviction.  (*See* Aug. 31, 2015 Hr'g Tr. 24–25.) Thus, in order to assess the merits of Mr. Serrano's motion to withdraw a guilty plea, the Court must first assess the merits of a motion to suppress evidence, even though such a motion was never filed in this case.

The Court held a hearing on August 31, 2015 to consider these matters.   Both parties were represented by counsel and were given a full opportunity to proffer and refute assertions of fact. The parties did not object, to any significant extent, to any of the relevant facts proffered during the hearing or in the parties' filings.   (*See* Aug. 31, 2015 Hr'g Tr. 3–5, 46.)   Having reviewed the parties' submissions and considered their arguments, the Court **DENIES** the motion.

## FINDINGS OF FACT

The Court makes the following factual findings based on the facts proffered by the parties.

1.   In March of 2012, the Drug Enforcement Agency (DEA) and Homeland Security Investigations (HSI) began investigating a methamphetamine organization operating in New Mexico.   (Resp. Ex. 7.)   The investigation identified Mr. Serrano's stepfather-in-law (Eleazar Olivas) as a methamphetamine trafficker in the Las Cruces, New Mexico area.   (Doc. 83 at 1.)

2.   On October 17, 2012, a confidential informant told HSI that Mr. Olivas had delivered methamphetamine to Mr. Serrano's father in Albuquerque, New Mexico.   (Resp. Ex. 1 at 11.) The informant reported that Mr. Olivas was waiting for Mr. Serrano's father to return the methamphetamine to Las Cruces later that evening.   (*Id.*)

3.   At 1:17 a.m. on October 17, 2012, HSI agents watched a gold Impala depart from Mr. Olivas' home in Las Cruces and merge northbound onto Interstate 25.   (*Id.* at 10.)   When the Impala reached the Border Patrol checkpoint, an agent identified Mayra Aguirre and Mr. Serrano as the occupants of the Impala.   (*Id.*)

4.   An HSI-Border Enforcement Security Taskforce (BEST) agent notified a Doña Ana Metro Narcotics officer, Officer Rios, about the Impala, its occupants, and the information from the confidential informant.   (*Id.* at 10–11.)

5.   At about 5:30 a.m., Officer Rios saw the Impala on Interstate 25, heading southbound to

Las Cruces.  (*Id.* at 4, 10.)   Officer Rios pulled the Impala over for travelling 80 mph in a 75 mph zone.  (*Id.* at 4.)

6.   While Officer Rios was issuing a written warning, he asked Mr. Serrano about his travel plans.  (*Id.*)   Mr. Serrano told Officer Rios that Mr. Serrano and his wife, Ms. Aguirre, drove to Truth or Consequences, New Mexico to transfer some paperwork and "get some stuff" from Mr. Serrano's father, who had travelled from Albuquerque to meet them.  (*Id.* at 11.)   Mr. Serrano volunteered that they arrived at Truth or Consequences "at 12:00" and ate at Denny's "for 15 to 30 minutes" while they waited for Mr. Serrano's father to arrive.  (*Id.* at 4.)

7.   Officer Rios became suspicious because "too much time had passed by from the time of arrival, departure, and the time of the traffic stop."  (*Id.*)   Officer Rios then told Mr. Serrano he was going to inspect the car's VIN and open the driver's side door to inspect the Nader sticker. (*Id.*)

8.   Officer Rios asked Ms. Aguirre what they had done while in Truth or Consequences.  (*Id.*) Ms. Aguirre stated she did not meet with Mr. Serrano's father, and instead, Mr. Serrano and his father met outside while Ms. Aguirre ate at Denny's.  (*Id.*)   When Officer Rios returned to the front of the police unit, he asked Mr. Serrano if he and Ms. Aguirre had stayed together at all times during their time in Truth or Consequences.  (*Id.* at 5.)   Mr. Serrano broke eye contact with the officer and replied "Yea."  (*Id.*)

9.   Officer Rios completed the warning, returned Mr. Serrano's documents, and informed Mr. Serrano that he was free to go.  (*Id.*)   As Mr. Serrano returned to his car, Officer Rios said, "By the way, can I talk to you?"  (*Id.*)   Mr. Serrano then walked back towards Officer Rios and agreed to speak with him.  (*Id.*)

10. After Mr. Serrano returned, Mr. Serrano stated that, while in Truth or Consequences, he

3

and his wife had only stopped to eat breakfast at Denny's and met Mr. Serrano's father.   (*Id.*)

11. Officer Rios approached Ms. Aguirre in the vehicle and she gave him permission to ask a few questions.   (*Id.*)   Officer Rios asked her when they met Mr. Serrano's father and she said "at 1:30."   (*Id.* at 5.)

12. Officer Rios returned to Mr. Serrano and asked him who was responsible for the contents of the vehicle.   (*Id.* at 6.)   Mr. Serrano replied, "I am responsible for everything."   (*Id.*)   Officer Rios then asked for, and received, written consent from both Mr. Serrano and Ms. Aguirre to search the vehicle.   (*Id.*)   As Ms. Aguirre exited the vehicle, Officer Rios noticed she "was not walking normally."   (*Id.*)

13. Officer Rios conducted a canine search of the Impala and the dog alerted on the front passenger side of the door area.   (*Id.* at 7.)

14. In the car, Officer Rios found a receipt from a Wal-Mart in Truth or Consequences from approximately 3:17 a.m. that morning.   (Resp. 5.)   The items listed in the receipt included K-Y Jelly, latex gloves, and cleaning napkins.   (Resp. Ex. 1 at 7.)   Officer Rios found these items in the car, along with a plastic bag that contained two used cleaning napkins.   (*Id.*)   One of the napkins appeared to have a brown fluid discharge and the other appeared to have a red fluid discharge.   (*Id.*)   Some of the latex gloves were missing from the package.   (*Id.*)

15. Mr. Serrano and Ms. Aguirre were transported to the DEA office.   (Resp. 5.)   Ms. Aguirre was informed of, and waived, her *Miranda* rights.   (Resp. Ex. 3 at 5.)   Ms. Aguirre then admitted she had narcotics concealed in a bodily cavity and removed three small bundles of methamphetamine from her body.   (*Id.*)   A field test determined that the bundles contained 79.9 net grams of pure methamphetamine.   (Resp. 5.)

16. At approximately 9:37 a.m., Assistant U.S. Attorney Rene Camacho and Border Patrol

4

Agent Julian Mora read Mr. Serrano his *Miranda* rights and Mr. Serrano waived his rights. (Resp. Ex. 1 at 12.)

17. The interviewers told Mr. Serrano that his wife had surrendered three bundles of methamphetamine, and Mr. Serrano simply responded, "okay."   (Doc. 86 at 5.)   The interviewers asked Mr. Serrano who had given them the methamphetamine, and Mr. Serrano said he did not want to say.   (Resp. Ex. 1 at 12.)   The interviewers then informed him he was going to be arrested for possession and conspiracy to distribute methamphetamine.   (*Id.* at 13.)

18.   After a requested break, Mr. Serrano told the interviewers he had been staying at Mr. Olivas' residence and admitted to owning a Smith & Wesson 9 mm pistol found at the residence pursuant to a federal search warrant.   (Resp. Ex. 1 at 15.)   Mr. Serrano was arrested and booked into the Doña Ana County Detention Center.   (Resp. 7.)

19. On October 22, 2012, Mr. Serrano told officers he had ingested methamphetamine. (Resp. Ex. 7 at 2.)   Mr. Serrano was admitted to Mountain View Regional Medical Center in Las Cruces.   (*Id.*)   On November 2, 2012, Mr. Serrano excreted a plastic material that tested positive for methamphetamine, but the amount was insufficient to test purity.   (*Id.* at 2–3.)

20. On November 3, 2012, Mr. Serrano excreted a second plastic bundle, which tested positive for methamphetamine.   (Resp. Ex. 8 at 2–3.)   This bundle of methamphetamine was 97% pure and weighed 27.41 grams.   (*Id.*)

21. Mr. Serrano was released from the hospital on December 19, 2012 and subsequently arrested.   (Resp. 8.)   He was later indicted for conspiracy, possession with intent to distribute 50 grams and more of methamphetamine, and possession of a firearm by a felon.   (Doc. 18.)

22. Initially, the Court appointed Stephen Hosford to represent Mr. Serrano.   On February 2, 2014, Mr. Hosford filed a motion to withdraw as attorney, citing "fundamental disagreements in

viewpoint and apparent communication failures." (Doc. 26.) Mr. Hosford described, among other issues, Mr. Serrano's desire to pursue a motion to suppress evidence, Mr. Hosford's opinion of the merits of the claim, and Mr. Hosford's concerns regarding sentence enhancements. (*Id.* at 2.) At their last meeting, Mr. Serrano "questioned counsel's loyalty and diligence in pursuing his requested strategy and defense." (*Id.*)

23. The Court, Judge Robert Brack presiding, informed Mr. Serrano that, although the Court would grant the motion this time, the Court was unlikely to allow a subsequent withdrawal of representation in the future. (Doc. 79 at 3.) On February 21, 2014, the Court granted Mr. Hosford's motion to withdraw. (Doc. 36.)

24. On February 26. 2014, Cori Ann Harbour-Valdez was appointed as Mr. Serrano's attorney. (Doc. 37.) On July 10, 2014, Mr. Serrano sent a letter to the Court stating that Mr. Serrano and Ms. Harbour-Valdez "ha[d] reached a point where" they could no longer proceed together. (Doc. 62 at 1.) Mr. Serrano cited, among other reasons, Ms. Harbour-Valdez's attempts to "force [Mr. Serrano] into accepting plea deals." (*Id.*) Mr. Serrano also submitted a motion to substitute his attorney by pro se representation. (Doc. 63.)

25. On July 10, 2014, Judge Robert Brack held a hearing to consider, in part, Mr. Serrano's motion to proceed pro se. (Doc. 66.) Mr. Serrano alleged that Ms. Harbour-Valdez had not completed review of the wiretap tapes from the investigation of Mr. Olivas, and Ms. Harbour-Valdez "[did not] want to review any more." (Jul. 10, 2014 Hr'g Tr. 6; Doc. 77 at 8.)

26. Mr. Serrano conceded, "I'm not foolish enough to believe I can beat the government at trial," but he did not want to sign a plea because there was "no justice" in the process. (Jul. 10, 2014 Hr'g Tr. 7.) Mr. Serrano said he wanted someone "to fight for [him]," and his family was looking to retain, but could not currently afford, another attorney. (*Id.* at 9.)

6

27. At the request of the Government, Mr. Serrano acknowledged he had been offered a plea for 14 years and his attorney had advised him that if he went to trial and was convicted, a mandatory life sentence was likely.   (*Id.* at 13.)

28. In explaining his objection to the offer, Mr. Serrano stated the amount of time was "not justifiable for what they allege I did, for what—the offense I committed."   (*Id.*)

29. The Court denied the motion, but reinforced to Mr. Serrano that if he wanted, he had "full opportunity to be represented [by Ms. Harbour-Valdez] at trial and go forward with any defense" Mr. Serrano thought he had.   (*Id.*; Doc. 66.)   The Court further informed Mr. Serrano that "the only thing that would change" the analysis behind the decision would be if Mr. Serrano retained representation, at which point Ms. Harbour-Valdez would "withdraw and that would necessitate a continuance of the trial . . . ."   (Jul. 10, 2014 Hr'g Tr. 14.)   At the close of the hearing, the Court explained to Mr. Serrano that if Mr. Serrano wanted to precede pro se, he still had the right to do so.   (*Id.* at 16.)   However, the Court advised against proceeding pro se and hoped Mr. Serrano could "reason with [his counsel] and understand that [Ms. Harbour-Valdez's] perspective has to be very focused on the law . . . ."   (*Id.*)

30. On the same day, Ms. Harbour Valdez informed Mr. Serrano that the deadline to file a motion to suppress evidence had passed.   (Aug. 31, 2015 Hr'g Tr. 11.)

31. On July 15, 2014, Judge Brack held a hearing wherein Mr. Serrano consented to a plea agreement for the three counts charged in the indictment.   (Doc. 68, 69.)   The Rule 11(c)(1)(C) plea agreement included a sentence of 14 years.   (Doc. 69.)   Mr. Serrano was advised that the minimum and maximum penalty for Counts 1 and 2 were ten years to life in prison and the maximum penalty for Count 3 was ten years in prison.   (Doc. 80 at 3–4.)

32. The Court addressed the hearing held five days prior, expressed surprise that Mr. Serrano

now wished to agree to a guilty plea, and asked Mr. Serrano to explain what had changed.   (*See*

Jul. 15, 2014 Hr'g Tr. 5–6.)   Mr. Serrano stated that the Court had rendered a decision on the

issues he brought up at the previous hearing, and Mr. Serrano did not understand why those issues

had to be discussed again.   (*Id.*)

33. Mr. Serrano confirmed that he understood he had a right to a trial by jury and he waived

that right if he chose to accept the plea agreement.   (*Id.* at 6.)   He further acknowledged that he

understood he had a right to be represented by counsel, even if he could not afford one and even if

he chose to proceed with a trial.   (*Id.* at 7.)   Mr. Serrano then "admit[ted] that there is a factual

basis for each element of the crimes" to which he pled.   (Doc. 68 at 4.)

34. Mr. Serrano informed the court that he received his "GED" when he was 16 and has since

taken several college courses.   (*Id.* at 9.)   Mr. Serrano stated "I'm intelligent enough to

understand the terms of the plea.   I understand what's going on, so I know what I'm signing.   I

know what I'm getting into and I'm ready to proceed."   (*Id.* at 11.)

35. Mr. Serrano confirmed that no one had threatened him to get him to sign the plea

agreement.   (*Id.*)   The Court asked Mr. Serrano if anyone had offered him anything, outside the

plea agreement itself, to sign the plea agreement and Mr. Serrano responded, "Everything that's

outlined in the plea is what's been told to me."   (*Id.*)

36. Mr. Serrano stated "[Ms. Harbour-Valdez] said she went in and negotiated the terms of this

plea and that those are the best we are going to get, so I take her word for it, you know?"   (*Id.* at

11.)   Mr. Serrano further stated " [W]hatever issues I've had with her, you've made a decision on

those issues, correct?   It's time to move on."   (*Id.*)

37. The Court outlined two options for Mr. Serrano.   (*Id.* at 12.)   The Court stated Mr.

Serrano could "persist in [his] not-guilty plea" and go to trial on August 11 or Mr. Serrano could

plead guilty pursuant to the plea agreement and be sentenced accordingly.   (*Id.*)   The Court asked Mr. Serrano how he wished to plead, and Mr. Serrano responded, "Guilty."   (*Id.*)

## CONCLUSIONS OF LAW

1.   Mr. Serrano contends his plea should be withdrawn pursuant to Rule 11(d)(2)(B) because (1) he is legally innocent because the Government lacks sufficient admissible evidence to convict him (Doc. 77 at 2–5); (2) the plea was not voluntary because Mr. Serrano was "out of options" once counsel refused to file the motion to suppress (Aug. 31, 2015 Hr'g Tr. 40); and (3) Mr. Serrano received ineffective assistance of counsel because counsel refused to file a motion to suppress evidence, (*id.* at 7–8).   The foundation of all of these claims is Mr. Serrano's assertion that the motion to suppress "is more than a frivolous motion," which his counsel could not refuse to file for Mr. Serrano.   (*Id.* at 39, 43.)

2.   Mr. Serrano argues his arrest on October 18, 2012 exceeded the bounds of a lawful stop under *Terry v. Ohio*, 392 U.S. 1 (1968).   (Doc. 77 at 5.)   Routine traffic stops qualify as investigatory detentions and are subject to the principles outlined in *Terry*.   *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998).   Moreover, a traffic stop is justifiable if the detaining officer has a "reasonable articulable suspicion that a traffic . . . violation has occurred or is occurring."   *United States v. McGehee*, 672 F.3d 860, 867 (10th Cir. 2012) (internal quotations omitted).   Since Mr. Serrano does not challenge the Government's assertion that Mr. Serrano was speeding prior to the stop (Aug. 31, 2015 Hr'g Tr. 17), the stop was justified.

3.   A *Terry* stop remains constitutional where the investigatory detention is "(1) justified at its inception and (2) reasonably related in scope to the circumstances which justified the interference in the first place."   *Id.* (internal quotations omitted).   Within the scope of a traffic stop, an officer "may request a driver's license and vehicle registration, run a computer check, and issue a

citation." *United States v. Harmon*, 742 F.3d 451, 458 (10th Cir. 2014).   An officer may also "ask routine questions about the driver's travel plans."   *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005).   Here, Officer Rios acted within the scope of the stop when he obtained Mr. Serrano's license and registration and asked Mr. Serrano and Ms. Aguirre about their travel plans.

4.   A detention may extend beyond its initial scope where there is reasonable and articulable suspicion that illegal activity has occurred or is occurring.   *Id.* at 1157.   Reasonable suspicion is determined by a totality of the circumstances, which can include suspicious travel plans and contradictory statements.   *See United States v. Villa*, 589 F.3d 1334, 1341 (10th Cir. 2009) (citing defendants' "unusual travel plans" and contradictory statements to justify reasonable suspicion based on the totality of the circumstances).   If Officer Rios' questions extended beyond the initial scope at any time during the stop, Officer Rios had reasonable suspicion to extend the stop for a limited inquiry.   Once Mr. Serrano told Officer Rios he met his father in Truth or Consequences and relayed a timeline for travel that did not comport with the time of the traffic stop, Officer Rios had sufficient reasonable suspicion to check the Impala's VIN and Nader sticker and ask Ms. Aguirre and Mr. Serrano if they had stayed together for the entire trip.   The contradictory timeline and the early hour of their trip, combined with the information Officer Rios already had regarding the Impala's departure from Mr. Olivas' house and Mr. Olivas' anticipated delivery of methamphetamine from Mr. Serrano's father, provided sufficient reasonable suspicion for any delay caused by this brief investigation.

5.   A stop may also extend beyond its initial scope if the interaction becomes a consensual encounter.   *Bradford*, 423 F.3d at 1157.   Consent depends on whether "a reasonable person would believe he was free to leave or disregard the officer's request for information."   *Villa*, 589

F.3d at 1339–40 (10th Cir. 2009) (determining the defendant should have felt free to leave after the officer returned the defendant's license and registration, even though the defendant was still seated in the back of the patrol car).   Mr. Serrano received his documents and had already begun to walk towards the car.   In response to Officer Rios' inquiry, he walked back to Officer Rios and agreed to speak further.   This interaction was consensual.

6.   Probable cause for a longer period of custody is not subject to a precise definition or percentage certainty, but instead depends on the totality of the circumstances.   *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).   Probable cause does not require proof beyond a reasonable doubt, or even demonstrate that the defendant's guilt was "more likely true than false."   *Texas v. Brown*, 460 U.S. 730, 742 (1983).   Instead, probable cause requires only a "fair probability," which is more than a bare suspicion, but less than a preponderance of evidence.   *United States v. Denson*, 775 F.3d 1214, 1217 (10th Cir. 2014).

7.   Officer Rios had significant evidence at his disposal to find probable cause.   Prior to the initial traffic stop, Officer Rios was aware of the information from HSI regarding the drug trafficking organization, Mr. Olivas' involvement, that Mr. Serrano had departed from Mr. Olivas' house the previous night, and that Mr. Olivas was waiting for a shipment of methamphetamine from Mr. Serrano's father.   During the traffic stop, Officer Rios observed the odd travel times and Mr. Serrano's conspicuous responses to questions.   After the consensual search, Officer Rios had a positive canine alert, found a Wal-Mart receipt that contradicted Mr. Serrano's version of events, and discovered recently purchased items that are often used in narcotics trafficking.   Officer Rios had probable cause to believe Mr. Serrano was either concealing drugs inside his body cavities or conspiring with Ms. Aguirre to conceal drugs.   Had Mr. Serrano filed a motion to suppress based on the validity of the traffic stop, the brief investigation during the stop, the consensual encounter,

11

or the arrest, the motion would likely have been denied.

8.   Mr. Serrano relies on the faulty assertion that a motion to suppress would have excluded evidence to support his motion to withdraw a guilty plea.   A defendant proceeding under Rule 11(d)(2)(B) does not have an absolute right to withdraw a guilty plea, and must instead assert a "fair and just reason for requesting withdrawal.   *See United States v. Rhodes*, 913 F.2d 839, 845 (10th Cir. 1990) ("There is no absolute right to withdraw a guilty plea.").   "Although a motion to withdraw a plea prior to sentencing should be 'freely allowed,' [the appellate court] will not reverse a district court's decision unless the defendant can show that the court acted 'unjustly or unfairly.' "   *United States v. Hamilton*, 510 F.3d 1209, 1213–14 (10th Cir. 2007).   The decision of whether to permit withdrawal of a plea "always and ultimately lies within the sound discretion of the district court to determine on a case by case basis . . . ."   *United States v. Soto*, 660 F.3d 1264, 1267 (10th Cir. 2011) (quotations omitted).

9.   The Tenth Circuit analyzes seven factors when considering a motion to withdraw a plea:

(1)  whether the defendant asserted his innocence,
(2)  whether the plea was knowing and voluntary,
(3)  whether defendant was assisted by counsel,
(4)  whether the defendant delayed filing his motion and, if so, why,
(5)  whether withdrawal would prejudice the government,
(6)  whether withdrawal would substantially inconvenience the court, and
(7)  whether withdrawal would waste judicial resources.

*Hamilton*, 510 F.3d  at 1214.   The Tenth Circuit suggests courts also consider the likelihood of conviction as part of the analysis.   *United States v. Sanchez-Leon*, 764 F.3d 1248, 1258 (10th Cir. 2014).   Among the factors, the most important to consider are whether the defendant asserted his innocence, the validity of his plea, and the effectiveness of his counsel.   *Hamilton*, 510 F.3d at 1217.   If the defendant cannot meet his burden to prove these factors, the Court need not address the remaining factors.   *Id.* (stating that the remaining factors focus on the potential burden on the

Government and the Court and "even if [the remaining] factors weigh in a defendant's favor, they cannot establish a fair and just reason for withdrawal.").

10. A defendant may assert factual or legal innocence.  *Hamilton*, 510 F.3d at 1214. Generally, "this factor only requires that [the defendant] assert his innocence."  *United States v. Coates*, 483 F. App'x 488, 493 (10th Cir. 2012) (noting an exception if the claim is conclusory); *see also United States v. Carr*, 80 F.3d 413, 420 (10th Cir. 1996) ("The District Court, although highly skeptical of [the defendant's] assertion of innocence, held that "this factor only requires that [the defendant] assert his innocence . . . .  We agree with the District Court's conclusion."). However, Mr. Serrano has never asserted his factual innocence.  (*See* Doc. 77 (denying only that ingestion was "knowingly and voluntary")).  Rather, Mr. Serrano has repeatedly admitted his guilt.  At the July 10, 2014 hearing, Mr. Serrano stated the proposed plea agreement was "not justifiable for . . . the offense I committed."  (Jul. 10, 2014 Hr'g Tr. 13.)  In the plea agreement, Mr. Serrano "admit[ted] that there is a factual basis for each element of the crimes" to which he pled.  (Doc. 68 at 4.)  In his motion to withdraw his guilty plea, Mr. Serrano denies, for the first time, "knowingly and voluntarily ingesting methamphetamine prior to his arrest[.]"  (*Id.*)  Even this statement falls short of affirmatively asserting factual innocence.  *See Smith v. Addison*, 373 F. App'x 886, 889 (10th Cir. 2010) ("[A duress] defense presents a legal justification for [a defendant's] conduct, not a claim of factual innocence.").

11. To assert a claim of legal innocence, "the defendant must present a *credible* claim . . . ." *Hamilton*, 510 F.3d at 1214.  To be credible, a claim must include a factual argument that supports the asserted defense.  *Hamilton*, 510 F.3d at 1215; *see also United States v. Norcutt*, 282 F. App'x 723, 725 (10th Cir. June 24, 2008) (determining that a claim was not factually supported where the argument for suppression relied on an inapplicable statute).  A defendant "is not

13

entitled to withdraw his plea simply because he possesses a non-frivolous defense theory." *United States v. Garcia*, 577 F.3d 1271, 1274 (10th Cir. 2009).

12. In his claim of legal innocence, Mr. Serrano first asserts that "insertion of that drug was done under duress for his life or the life of his immediate family members."   (Doc. 77 at 2.)   Mr. Serrano's counsel, however, admits he is "uncomfortable with the duress defense."   (Aug. 31, 2015 Hr'g Tr. 9.)   Mr. Serrano submits no additional facts or evidence to support his claim of duress.   Consequently, Mr. Serrano's conclusory assertion of duress is insufficient to assert legal innocence.   *See Coates*, 483 F. App'x at 493.

13. Mr. Serrano next claims he is legally innocent because a motion to suppress evidence would have excluded evidence necessary to convict him.   Although this Court stops short of determining that a motion to suppress evidence in this case would have been frivolous, the Court has determined that it is unlikely to have prevailed.   Thus, the facts do not support an assertion of legal innocence.   *See Hamilton*, 510 F.3d at 1215; *see also Garcia*, 577 F.3d at 1274 (noting a non-frivolous defense theory does not entitle a defendant to withdraw his plea).

14. To assert that his plea was neither voluntary nor knowing, Mr. Serrano argues that he had no choice but to plea because appointed counsel (1) refused, despite Mr. Serrano's request, to file a motion to suppress evidence and (2) allowed the deadline to file the motion to pass.   (Aug. 31, 2015 Hr'g Tr. 9.)   Since Mr. Serrano was not aware he had a constitutional defense, Mr. Serrano also claims it was not "intelligent" to waive his right to appeal any court ruling denying his motion to suppress.   (Doc. 77 at 8.)

15. "The longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternatives courses of action open to the defendant."   *United States v. Sanchez-Leon*, 764 F.3d 1248, 1259 (10th Cir. 2014).   "[T]o

determine whether a plea is voluntary, a court must assess whether the defendant fully understood the consequences of the plea." *United States v. Gigot*, 147 F.3d 1193, 1197 (10th Cir. 1998) (quoting *United States v. Williams,* 919 F.2d 1451, 1456 (10th Cir. 1990)).   Further, the "solemn declarations made in open court carry a strong presumption of verity."   *Sanchez-Leon*, 764 F.3d at 1259 (quoting *Tovar Mendoza v. Hatch*, 620 F.3d 1261, 1269 (10th Cir. 2010)).

16. Mr. Serrano's plea was voluntary because it was not coerced and Mr. Serrano understood the consequences of his decision.   At the plea hearing, Mr. Serrano testified he had not been threatened or coerced into signing the plea agreement.   (Jul. 15, 2014 Hr'g Tr. 10.)   Mr. Serrano also confirmed that he understood the rights he waived by entering a plea agreement.   (*Id.* at 6–7.)

17. Mr. Serrano's plea was knowing because he understood the alternative courses of action and made his own decision.   At the plea hearing, Mr. Serrano stated "I'm intelligent enough to understand the terms of the plea.   I understand what's going on, so I know what I'm signing.   I know what I'm getting into and I'm ready to proceed."   (*Id.* at 11.)   The Court clearly outlined two potential options: going to trial or entering a plea agreement and accepting the consequences. (*Id.* at 12.)   Mr. Serrano considered these options and chose to plead guilty.   (Jul. 15, 2014 Hr'g Tr. 12.)   In his own words, Mr. Serrano indicated that it was "time to move on."   (*Id.* at 11.) These solemn declarations made in open court carry strong weight and a presumption of truth. *See Sanchez-Leon*, 764 F.3d at 1259.   Thus, Mr. Serrano fails to carry his burden on this factor.

18. Mr. Serrano next argues he received ineffective assistance of counsel because his appointed counsel refused to file a motion to suppress evidence.   (Doc. 77 at 7.)   To establish ineffective assistance of counsel, a defendant must show "(1) that the counsel's performance was deficient, and (2) that this deficiency prejudiced his defense." *Hamilton*, 510 F.3d at 1216. Counsel's competence is presumed. *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986).   A

defendant can only rebut this presumption by proving that counsel acted unreasonably, based on prevailing professional norms, and counsel's decision "was not sound strategy."   *Id.* Reasonableness, moreover, is based on "counsel's perspective at the time of the alleged error and in light of all the circumstances."   *Id.*   Even so, counsel must investigate or "make a reasonable decision that makes particular investigations unnecessary."   *Id.* (holding counsel provided ineffective assistance where counsel failed to file a motion to suppress "not due to strategic considerations" but because counsel was unaware of the Government's intent to present incriminating evidence); s*ee also United States v. Ramos,* 42 F. App'x 318, 323 (10th Cir. 2002) (upholding district court's decision to deny a motion to substitute counsel where appointed counsel refused, inter alia, to file motions to suppress that the attorney determined were not appropriate).

19. Ms. Harbour-Valdez's assistance was not ineffective, because her decision not to file a motion to suppress was a sound strategic decision.   Prior to his current counsel, Mr. Serrano received the assistance of two experienced defense attorneys and both attorneys advised Mr. Serrano to plead guilty.   (Doc. 83 at 21.)   Mr. Hosford, Mr. Serrano's first attorney, advised Mr. Serrano "on the merits of pursuing suppression" and Mr. Serrano "questioned [Mr. Hosford's] loyalty and diligence in pursuing [Mr. Serrano's] requested strategy and defense."   (Doc. 26 at 2.) The Court has already determined that the suppression defense would, likely, not have prevailed.

20. Ms. Harbour-Valdez did not have to completely review all wiretap tapes associated with the investigation of Mr. Olivas before deciding not to file a motion to suppress evidence.   It is irrelevant that Mr. Serrano was not specifically mentioned on the wiretap tapes, because Officer Rios was justified in conducting the traffic stop and Mr. Serrano later consented to engage further with Officer Rios.   When weighed against a life sentence if convicted, Ms. Harbour-Valdez's advice to accept a plea offer of 14 years was well within the range of competence required of

16

criminal defense attorneys.   *See United States v. Hamilton*, 510 F.3d 1204, 1216 (10th Cir. 2007).

21. Moreover, to establish prejudice in the context of a guilty plea, the defendant must show "but for counsel's errors [the defendant] would not have pled guilty."   *Id*.   "[T]he best evidence of whether a defendant in fact would have changed his plea and insisted on going to trial" may be the strength of the prosecutor's case.   *Miller v. Champion*, 262 F.3d 1066, 1072 (10th Cir. 2001). Mr. Serrano has failed to show that, had Ms. Harbour-Valdez filed the motion to suppress, Mr. Serrano would not have pled guilty.   Based on the overwhelming evidence discovered after arrest, Mr. Serrano would likely only have gone to trial if the motion to suppress had been granted. Since the motion would likely have failed, Mr. Serrano has not shown he was prejudiced, and consequently, this factor also weighs in favor of the government

22. Although not an official factor, the likelihood of conviction also weighs against Mr. Serrano.   *See United States v. Sanchez-Leon*, 764 F.3d 1248, 1258 (10th Cir. 2014).   Since the motion to suppress would likely have failed, the evidence in this case is overwhelming.   Mr. Serrano excreted a bundle of 26.2 grams of methamphetamine from his bodily cavity.   (Doc. 83 at 22.)   Mr. Serrano further admitted to owning the Smith & Wesson 9 mm pistol police found at Mr. Olivas' house, where Mr. Serrano was staying at the time.   (Doc. 83 at 22.)   Consequently, the likelihood of conviction in this case was extremely high.

23. The remaining factors address the potential burden on the government and the court, and these factors consequently cannot establish a fair and just reason for withdrawal.   *Hamilton*, 510 F.3d at 1217.   Thus, the Court need not address these factors because the Mr. Serrano has not first established a fair and just reason for withdrawal.   *See id.*, 510 F.3d at 1217.

24. Mr. Serrano has failed to establish any fair and just reason to withdraw his plea.   Mr. Serrano's arguments to the contrary are unpersuasive.

**THEREFORE,**

      **IT IS ORDERED** that Defendant's Motion to Withdraw Plea of Guilty, (Doc. 77), filed July 7, 2015, is **DENIED**.

                                      _____
                                        **ROBERT C. BRACK**
                                        **UNITED STATES DISTRICT JUDGE**

18